# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INMARSAT GLOBAL LIMITED, <br><br> Appellant, <br><br> v. <br><br> AST & SCIENCE, LLC, and LIGADO NETWORKS, LLC, <br><br> Appellees. | Civ. No. 26-cv-00394-GBW <br><br> Bankruptcy Case No. 25-10006 (TMH) |

## OPENING BRIEF ON APPEAL

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Benjamin Finestone
Kate Scherling
295 5th Avenue
New York, NY  10016
(212) 849-7000
benjaminfinestone@quinnemanuel.com
katescherling@quinnemanuel.com

John Bash
Matthew Scheck
Jacob C. Beach
300 West 6th St., Suite 2010
Austin, TX  78701
(737) 667-6100
johnbash@quinnemanuel.com
matthewscheck@quinnemanuel.com
jacobbeach@quinnemanuel.com

STEPTOE LLP

Alfred M. Mamlet
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000
amamlet@steptoe.com

Charles Michael
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
cmichael@steptoe.com

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones
Peter J. Keane
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(302) 652-4100
ljones@pszjlaw.com
pkeane@pszjlaw.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

JURISDICTIONAL STATEMENT .......................................................................... 1

ISSUES PRESENTED ................................................................................................ 1

PRELIMINARY STATEMENT .............................................................................. 3

BACKGROUND AND PROCEDURAL HISTORY .............................................. 5

    A.    The Cooperation Agreement, Proposed AST Transaction, And Settlement Term Sheet  5

    B.    A Dispute Derails Negotiations .................................................................. 8

    C.    The FCC Application And Inmarsat's New York Complaint ......................... 9

    D.    Appellees Move The Bankruptcy Court To Dismiss Inmarsat's New York Complaint 10

    E.    ███████████████████████ ................................................... 10

    F.    ███████████████████ ................................................... 12

    G.    The Delay Motion And The Escrow Order ................................................. 13

SUMMARY OF THE ARGUMENT ...................................................................... 15

STANDARD OF REVIEW ...................................................................................... 17

ARGUMENT .............................................................................................................. 17

I.    THE BANKRUPTCY COURT LACKED AUTHORITY TO "EQUITABLY" MODIFY THE COOPERATION AGREEMENT'S UNAMBIGUOUS TERMS .............. 17

    A.    The Cooperation Agreements' Unambiguous Terms Preclude The Relief Imposed By The Bankruptcy Court .................................................................. 18

    B.    The Bankruptcy Court Lacked The Equitable Power To Rewrite The Cooperation Agreement .................................................................................................. 20

    C.    Bankruptcy Code Section 105(a) Does Not Provide An Independent Basis Of Authority For The Bankruptcy Court's "Roving Commission of Equity" ............... 26

II.    EVEN IF THE BANKRUPTCY COURT HAD THE AUTHORITY TO ENTER THE ESCROW ORDER, ITS PROCESS AND FINDINGS WERE INADEQUATE ................ 27

    A.    The Equitable Relief Granted By The Bankruptcy Court Required An Adversary Proceeding Under Rule 7001(g) .............................................................. 28

    B.    The Bankruptcy Court Should Not Have Exercised Jurisdiction Over A Dispute Governed by the Cooperation Agreement's Exclusive Forum Provision ............... 32

        1.    The Cooperation Agreement's Exclusive Forum Provision Governs This Dispute ..... 32

        2.    The Exclusive Forum Provision Should Be Enforced ................................. 33

III.    EVEN IF THE EQUITIES WERE RELEVANT, THEY DO NOT FAVOR THE BANKRUPTCY COURT'S MODIFICATION OF THE TERMS OF THE COOPERATION AGREEMENT .................................................................... 35

A.      The Bankruptcy Court's Equitable Justification Relies On A Chain of Speculation..... 36

B.      ████████████████████████████████████████ .................. 39

**CONCLUSION** .................................................................................................................... **42**

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Almarc Corp.*,
94 B.R. 361 (Bankr. E.D. Pa. 1988) ...................................................................34

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
106 N.E.3d 1176 (N.Y. 2018).............................................................................20

*ARP Films, Inc. v. Marvel Entertainment Group, Inc.*,
952 F.2d 643 (2d Cir. 1991).................................................................................27

*In re Axiant, LLC*,
2012 WL 5614588 (Bankr. D. Del. Nov. 15, 2012) ............................................34

*Benisek v. Lamone*,
585 U.S. 155 (2018)..............................................................................................31

*Brisbin v. Superior Valve Co.*,
398 F.3d 279 (3d Cir. 2005).................................................................................24

*Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*,
709 F.2d 190 (3d Cir. 1983).........................................................................33, 35

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004)......................................................................3, 15, 26

*In re Continental Airlines*,
203 F.3d 203 (3d Cir. 2000).................................................................................26

*In re Continental Airlines, Inc.*,
236 B.R. 318 (Bankr. D. Del. 1999) .....................................................................29

*In re Diaz Contracting, Inc.*,
817 F.2d 1047 (3d Cir. 1987)......................................................................16, 33, 34

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)..............................................................................................31

*In re Exide Techs.*,
544 F.3d 196 (3rd Cir. 2008) ...............................................................................34

*In re Forever 21, Inc.*,
623 B.R. 53 (Bankr. D. Del. 2020) ......................................................................35

*General Textile Printing & Processing Corp. v. Expromtorg International Corp.*,
862 F. Supp. 1070 (S.D.N.Y. 1994)..................................................................................39

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999).........................................................................................................39

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024).................................................................................................15, 26

*In re Imerys Talc America, Inc.*,
38 F.4th 361 (3d Cir. 2022) .............................................................................................17

*In re Kalikow*,
602 F.3d 82 (2d Cir. 2010)...............................................................................................29

*Law v. Siegel*,
571 U.S. 415 (2014).........................................................................................................26

*In re Ligado Networks, LLC*,
2026 WL 611177 (3d Cir. Mar. 2, 2026)..........................................................................23

*In re Mansaray-Ruffin*,
530 F.3d 230 (3d Cir. 2008)......................................................................................28, 30

*Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2nd Cir. 1990)...........................................................................................24

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988).........................................................................................................26

*Parlux Fragrances, LLC v. S. Carter Enterprises, LLC*,
204 A.D.3d 72 (1st Dep't 2022) .................................................................................17, 38

*In re Penn Central Transportation Co.*,
831 F.2d 1221 (3d Cir. 1987)..........................................................4, 6, 14, 15, 21, 22, 23

*In re Perkins*,
902 F.2d 1254 (7th Cir. 1990) .........................................................................................29

*In re Prehired, LLC*,
2025 WL 2661765 (D. Del. Sept. 17, 2025).....................................................................29

*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
589 U.S. 35 (2020)..............................................................................................................1

*Scharf v. Levittown Public Schools*,
970 F. Supp. 122 (E.D.N.Y. 1997) ...................................................................................25

*In re Spier Aircraft Corp.*,
  137 F.2d 736 (3d Cir. 1943)............................................................................40

*In re SS Body Armor I, Inc.*,
  615 B.R. 540 (Bankr. D. Del. 2020) ...............................................................29

*In re Telephone Warehouse, Inc.*,
  124 F. App'x 724 (3d Cir. 2005) .....................................................................23

*The Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972).............................................................................................33

*In re Truong*,
  513 F.3d 91 (3d Cir. 2008)..................................................................................1

*United States v. Pepperman*,
  976 F.2d 123 (3d Cir. 1992).............................................................................26

*United States v. Texas*,
  144 S. Ct. 797 (2024).......................................................................................41

*Wolf v. Wolf*,
  59 F. App'x 403 (2d Cir. 2003) .......................................................................25

*In re WorldCorp, Inc.*,
  252 B.R. 890 (Bankr. D. Del. 2000) ...............................................................23

## Statutes

11 U.S.C. § 105(a) ...........................................................1, 14, 15, 17, 18, 19, 26, 27, 35

11 U.S.C. § 362(a)(3).........................................................................................................10

## Other Authorities

47 C.F.R. § 25.154(a)(2).....................................................................................................10

Fed. R. App. P. 8(a)(1).................................................................................................11, 40

Fed. R. Bankr. P. 7001(g) .............................................................................1, 16, 17, 27, 28, 29

Appellant Inmarsat Global Limited ("Inmarsat") files this opening brief in support of its appeal of the April 2, 2026 order of the Bankruptcy Court (Horan, J.).[1]

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear an appeal of a final order of a bankruptcy court. 28 U.S.C. § 158(a)(1). The Bankruptcy Court's April 2, 2026 order is final because it modified the terms of Appellant's contract with Appellees Ligado Networks LLC ("Ligado") and AST & Science, LLC ("AST"), relieving Appellees from their contractual obligation to make an indefeasible, $100 million payment to Appellant on March 31, 2026, thereby conclusively resolving all issues raised in the contested matter before the Bankruptcy Court. *See Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020) ("Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."); *In re Truong*, 513 F.3d 91, 94 (3d Cir. 2008). Appellant filed its notice of appeal on April 7, 2026, within fourteen days of entry of the April 2, 2026 order. Fed. R. Bankr. P. 8002(a)(1).

## ISSUES PRESENTED

1. Whether the Bankruptcy Court erred in invoking 11 U.S.C. § 105(a) as freestanding authority to modify an unambiguous post-petition contract pursuant to purported equitable powers outside of the application of any other provision of the Bankruptcy Code.

2. Whether, even assuming such authority existed, the Bankruptcy Court erred in exercising such authority over a dispute governed by an exclusive forum selection provision directing all disputes to New York courts and in proceeding by mere motion rather than adversary proceeding as required under Federal Rule of Bankruptcy Procedure 7001(g).

---

[1] Citations in the form "ROA.___" refer to pages of the Record on Appeal accompanying this brief.

3.  Whether, on this record, the Bankruptcy Court erred in impounding an indefeasible contractual payment based on speculative, unripe claims that Ligado itself has repeatedly disclaimed before other tribunals.

## PRELIMINARY STATEMENT[2]

There is another appeal pending before this Court concerning the same parties. Civ. No. 26-cv-118. In that appeal, among other things, the Bankruptcy Court ordered specific performance under the parties' very complex Cooperation Agreement, after a non-evidentiary hearing on 12-days' notice, notwithstanding the absence of any operative claims pending before the Bankruptcy Court and notwithstanding the fact that the parties had agreed to, and the Bankruptcy Court had approved, New York as the exclusive venue to resolve disputes.

Less than three months later, the Bankruptcy Court did it again. This time, the Bankruptcy Court purported to *modify* the same Cooperation Agreement that it purported previously to *enforce*, rerouting to "escrow" a $100 million payment due to Inmarsat on March 31, 2026. As it did before, the Bankruptcy Court acted after a non-evidentiary hearing on 14-day notice, notwithstanding the absence of any operative claims pending before the Bankruptcy Court and notwithstanding the fact that the parties had agreed to, and the Bankruptcy Court had approved, New York as the exclusive venue to resolve disputes.

The Bankruptcy Court's alarming practice of *twice* depriving Inmarsat of due process is independent cause for reversal (in both appeals). However, even assuming *arguendo* that there was an actual lawsuit properly before the Bankruptcy Court such that due process could have been rendered, and even assuming *arguendo* that Inmarsat's first appeal is without merit, this appeal presents an open and shut case for reversal. Neither Congress nor the Constitution has granted the Bankruptcy Court "a roving commission to do equity." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (quotation omitted). The Bankruptcy Court had no authority to modify the parties' Cooperation Agreement "absent a showing of fraud, accident or mistake"—which no

---

[2] Capitalized terms not immediately defined have the meanings given to them below.

party asserted and the Bankruptcy Court did not find. *In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987).

All of this applies with great force here.



Finally, even if the Bankruptcy Court possessed roving equity power—and it does not—sequestering $100 million due Inmarsat because a hypothetical, unfiled claim against Inmarsat might have merit was improper. No matter how strongly a would-be plaintiff believes in its claims, relief must await judgment, or, in extreme satiations, a pre-judgment attachment. But Ligado did not even try to make the heightened showing required for an attachment (*e.g.*, that it is likely to win a judgment that will be fraudulently rendered uncollectible), nor could it. Among the many problems with Ligado's hypothetical claim for future damages is that it piles speculation on speculation.

No notion of equity can justify seizing $100 million based on this sort of crystal ball conjecture about what Ligado *might* prove based on unknown, future events.

The Bankruptcy Court's order(s) should be reversed.

**BACKGROUND AND PROCEDURAL HISTORY**

A.   **The Cooperation Agreement, Proposed AST Transaction, And Settlement Term Sheet**

In 2007, Inmarsat entered into a 100-year "Cooperation Agreement" with predecessors of Appellee Ligado to "coordinat[e]" the parties' licensed spectrum in the L-band.  ROA.453. Among other things, under the Cooperation Agreement, which was amended and restated in 2010 and further amended numerous times, Inmarsat restricted its own North American operations in the L-band to provide Ligado with more contiguous spectrum for its anticipated operations. ROA.38-39; 447-94.  In return, Ligado agreed to make quarterly payments to Inmarsat and to Inmarsat's exclusive use of the L-band outside North America.  ROA.475.

Ligado missed numerous payments dating back to 2016 and owed Inmarsat more than $500 million at the time it filed for Chapter 11 bankruptcy in January 2025.  ROA.1755.  In April 2025, Ligado moved for Bankruptcy Court approval of the "AST Transaction" that was the centerpiece of its pre-planned reorganization.  Case No. 25-10006 (Bankr. D. Del.), D.I. 352.  Under the AST Transaction, Ligado will sublease to AST its spectrum rights under the Cooperation Agreement. AST is an early-stage company with plans to deploy a large non-geostationary satellite constellation (the "Proposed NGSO System").  *See* AST SpaceMobile, Inc., Annual Report (Form 10-K) at 8, 17 (filed Mar. 2, 2016).  The original Cooperation Agreement coordinated only geostationary satellite operations ("GSOs").

Inmarsat objected on several grounds.  ROA.384-98.  Most relevant here, Inmarsat was due more than $500 million under the Cooperation Agreement as of the petition date—an amount that was increasing over time.  ROA.386.  Under the proposed AST Transaction, Ligado and AST sought to defer any decision on whether to assume the Cooperation Agreement and its associated spectrum rights—and to defer any associated cure payment—unless and until the Federal

Communications Commission ("FCC") approved AST's Proposed NGSO System. *Id.* Having this enormous cure payment be contingent on FCC approval was highly objectionable to Inmarsat, and even more so given Ligado's recognition that the regulatory process was uncertain and could take up to three years, over which time the cure balance would have grown to approximately $1 billion. *Id.*

The Bankruptcy Court encouraged mediation, and the parties obliged. ROA.401. The mediation, which was overseen by a retired bankruptcy judge, resulted in a binding "Term Sheet" that the Bankruptcy Court approved in June 2025. ROA.399-414. As the Bankruptcy Court determined, the Term Sheet was "a valid, binding contract, it was negotiated at arm's length through mediation under Judge Drain, and all the parties of course, having signed onto the mediated agreement, urged this Court to approve it[.]" ROA.1916. The Term Sheet provided that the parties would enter into a further amended and restated Cooperation Agreement. ROA.404-05. As described below, pursuant to Bankruptcy Court order, the parties entered into the 22nd amendment to the Cooperation Agreement on September 21, 2025 (collectively, with the original agreement and all amendments, referred to as the "Cooperation Agreement"). ROA.1746-60.

The Cooperation Agreement reflects a carefully calibrated tradeoff with respect to payment. Inmarsat would receive $520 million in cure payments in installments on two dates certain ($420 million on October 31, 2025 and $100 million on March 31, 2026), and would waive $101 million in cure payments that otherwise would have been due. ROA.1755.



██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

The Cooperation Agreement further provides that all disputes (with one inapplicable exception) be adjudicated in New York (the "Exclusive Forum Provision").  ROA.1754-55 n.12.

### B.    A Dispute Derails Negotiations

After agreeing on the Term Sheet, the parties negotiated amendments to coordinate the operation of AST's NGSO satellites.  ROA.1692-1744.  Engineers and regulatory personnel held multiple conference calls to address relevant technical, geographic, and operational parameters from the unique circumstances and new interference environment presented by the combined operation of all the NGSO satellites in AST's contemplated system.  *Id.*  Inmarsat believed that these discussions were part and parcel of all parties' Term Sheet obligations.

After months of negotiations, talks broke down over whether AST would be required to abide by the longstanding term governing Inmarsat's exclusive right to use L-band spectrum outside North America—a contractual term to which Ligado first agreed in 2007 as part of the consideration underlying the Cooperation Agreement, and that has remained unchanged ever since.  ROA.431-32, 547.  In August 2025, Inmarsat and Ligado filed competing motions asking the Bankruptcy Court to enforce what each side believed were the Term Sheet's obligations.  ROA.415-41, 625-53.

On September 2, 2025, the Bankruptcy Court issued an order that, in effect, abstained from deciding whether AST's satellite operations outside of North America were subject to the terms of the Cooperation Agreement.  ROA.674-76.  Instead, the Bankruptcy Court directed the parties "to incorporate the specific language of the [] Term Sheet" into the to-be-amended version of the Cooperation Agreement, ROA.676, leaving the geographic dispute for another day.  Thereafter, pursuant to the Bankruptcy Court's September 2 order, the parties executed Amendment No. 22

to the Cooperation Agreement that attached, and incorporated by reference, the Term Sheet. ROA.1746-60.

### C.    The FCC Application And Inmarsat's New York Complaint

In November 2025, Inmarsat invited Ligado to resume the NGSO coordination efforts that had been sidetracked by the dispute over geography.  ROA.1777-78.

██████████████████████████████████████████████████████████

████████████████

### D.    Appellees Move The Bankruptcy Court To Dismiss Inmarsat's New York Complaint

On January 2, 2026, Ligado and AST filed motions in the Bankruptcy Court that sought to force Inmarsat to dismiss its New York complaint with prejudice, which they argued was filed in violation of the Bankruptcy Code's automatic stay, and to compel Inmarsat to support the FCC application. ROA.829-50, 944-67. The Bankruptcy Court held a hearing on January 14, 2026, and issued its oral ruling on January 27, 2026, which was confirmed by a written order dated January 30, 2026 (the "January Order"). ROA.1814-82, 1884-85, 1896-1930.

The Bankruptcy Court ruled that Inmarsat's prosecution of the New York action violated the automatic stay because it "constitutes an attempt to exercise control over property of the estate" under 11 U.S.C. § 362(a)(3). ROA.1910. On the merits, the court interpreted the Cooperation Agreement not to impose any "additional coordination process beyond" what was set forth in the Term Sheet. ROA.1913. The Bankruptcy Court directed Inmarsat to support the FCC application and dismiss the New York action "with prejudice." ROA.1918.

The FCC accepted Ligado's application on January 30, 2026. ROA.2308 n.1. Comments in response to the application were due March 2, 2026. 47 C.F.R. § 25.154(a)(2).

### E.    ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████







**F.**



### G.      The Delay Motion And The Escrow Order

On March 16, 2026—approximately two weeks before the $100 million cure payment came due—Ligado (joined by AST) moved the Bankruptcy Court (the "Delay Motion") for an order "relieving" Ligado of its obligation to make the contractual payment to Inmarsat and directing that the payment instead be held in escrow, without interest, "until the earlier of (a) the Effective Date [of Ligado's plan of reorganization] or (b) if such amount is not offset by damages owed by Inmarsat to Ligado and/or AST, final resolution of any potential litigation arising from Inmarsat's breach of the Mediated Agreement."   ROA.2050; *see generally* ROA.2043-59. Appellees' requested relief was premised on the possibility that they "may" assert some hypothetical future claims against Inmarsat based upon alleged breaches of the Cooperation Agreement, namely, Inmarsat's filing of the Petition to Deny and New York complaint. ROA.2055-56.

The Delay Motion invoked Bankruptcy Code section 105(a) as the sole statutory basis for the relief. ROA.2050. It did not seek to commence an adversary proceeding despite seeking equitable relief. It did not attempt to engage with the Exclusive Forum Provision. And it did not invoke either of the remedies the Cooperation Agreement itself authorizes in Section 5 thereof for alleged breaches of Inmarsat's regulatory support obligation. Indeed, the Delay Motion stated, "Ligado is not seeking monetary damages for Inmarsat's breach of the [Cooperation Agreement] and thus, Ligado's obligation to make an election as to its sole and exclusive remedy, as set forth in Section 5 of the [Cooperation Agreement], is not triggered." ROA.2056 n.14; *see also* ROA.2755 ("[W]e are not making the election to pursue contract damages; we are, instead, simply asking for equitable and injunctive relief.").

Inmarsat objected. ROA.2160-87. A non-evidentiary hearing was held two weeks later on March 30, 2026, and the Bankruptcy Court ruled from the bench that "the payment be made no later than tomorrow into escrow in an interest-bearing account." ROA.2794. The Bankruptcy Court found the facts distinguishable from the Third Circuit's holding in *In re Penn Cent. Transp. Co.*, 831 F.2d 1221 (3d Cir. 1987), which prohibits bankruptcy courts from re-writing the terms of freely negotiated contracts. The Bankruptcy Court reasoned that, unlike in *Penn Central*, a "live dispute" existed over Inmarsat's "breaches of reciprocal obligations under this same contract," producing a "colorable argument that Ligado has a breach claim under Section 5." ROA.2794-95. Yet the court disclaimed any merits assessment: "I'm not passing on whether such a breach claim would be successful, just that it appears on the undisputed facts here that there may be such a claim." ROA.2795. A written order followed on April 2, 2026 (the "Escrow Order"), which granted the motion "as set forth on the record at the March 30, 2026 hearing" and added no further reasoning. ROA.2799-80. In neither its oral ruling nor the Escrow Order did the Bankruptcy

Court identify any Bankruptcy Code provision other than section 105(a).  It made no finding that Ligado was likely to prevail on any alleged breach. It made no finding that Inmarsat could not satisfy a future judgment.  It did not address the Exclusive Forum Provision.  It did not address the contractual sole-and-exclusive-remedy architecture.  There was no evidentiary hearing, let alone an adversary proceeding.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court lacked authority to modify the Cooperation Agreement's plain terms.  The Cooperation Agreement requires Ligado to make payments to Inmarsat on specified dates and provides sole-and-exclusive remedies for any alleged breach of Inmarsat's regulatory support obligations:  either a suit for monetary damages or the revival of Ligado's prior lawsuit against Inmarsat.  The Exclusive Forum Provision requires any such claim to be litigated in a New York court.  The Bankruptcy Court overrode all of it.

Instead, the Bankruptcy Court drew upon purported "equitable" powers to allow Ligado and AST to avoid the $100 million cure payment without making the requisite election of remedies and without filing any complaint (let alone one in the parties' agreed-upon forum).  The Third Circuit, however, has held categorically that "an equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake." *In re Penn Cent. Transp. Co.*, 831 F.2d at 1228.  Bankruptcy Code section 105(a)—the Bankruptcy Court's sole cited statutory basis— does not alter this rule.  Section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code," *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216 n.2 (2024), and is not "a roving commission to do equity," *In re Combustion Eng'g, Inc.*, 391 F.3d at 236 (quotation omitted).

Moreover, even if a court could stay performance under a contract, the Bankruptcy Court's process and findings were woefully inadequate.  Not only did the Bankruptcy Court fail to require

an adversary proceeding under Bankruptcy Rule 7001(g), there was no evidentiary hearing at all and it did not make any of the findings generally required for extraordinary relief like a stay or injunctive relief—including likelihood of success, irreparable harm, or Inmarsat's inability to pay damages if it were ever ordered to do so.  Indeed, the Bankruptcy Court merely found that if Ligado ever decided to sue, it would have a "colorable . . . breach claim" for which it might seek monetary damages and that staying the payment would protect that potential right of recovery.  ROA.2864. These "findings"—made without any evidentiary record—do not come close to supporting the relief the Bankruptcy Court granted.

In any event, the Bankruptcy Court would not have been the right court to make those findings.  The parties' agreement mandates that disputes be litigated in a New York court, and the Third Circuit requires bankruptcy courts to enforce forum selection clauses absent a "strong showing of unreasonableness and injustice."  *In re Diaz Contracting, Inc.*, 817 F.2d 1047, 1054 (3d Cir. 1987).  Ligado and AST did not even attempt to carry their heavy burden of overcoming the clause they negotiated, and the Bankruptcy Court failed to address it altogether.

█████ And New York law, which governs the Cooperation Agreement, forbids the result: "'[T]here is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable.'" *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 204 A.D.3d 72, 89 (1st Dep't 2022). A party wanting immediate relief for an unliquidated liability must meet the stringent standards for a prejudgment attachment, which Ligado did not attempt to do.

## STANDARD OF REVIEW

This Court "review[s] the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion." *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 370 (3d Cir. 2022). Each of the threshold questions presented—the scope of the Bankruptcy Court's equitable powers and of Bankruptcy Code section 105(a), enforcement of the Exclusive Forum Provision, the reach of Bankruptcy Rule 7001(g), and the interpretation of the Cooperation Agreement's remedial provisions—is a question of law reviewed de novo. Any residual equitable findings are reviewed for abuse of discretion, but a court abuses its discretion when it rests its analysis on a legal error.

## ARGUMENT

## I.   THE BANKRUPTCY COURT LACKED AUTHORITY TO "EQUITABLY" MODIFY THE COOPERATION AGREEMENT'S UNAMBIGUOUS TERMS

It is undisputed that the Bankruptcy Court's order rewrites the parties' contract. Ligado and Inmarsat, sophisticated parties advised by sophisticated counsel, negotiated a precise payment structure: two indefeasible cure payments on dates certain in return for Inmarsat's agreement to waive more than $100 million in otherwise-owed cure amounts, with a single comparatively small payment from Ligado to Inmarsat which was, by contrast, tied to FCC approval. ROA.1755. ████

████████████████████████████████████████

████████████████████████████████████████



, yet the Bankruptcy Court's Escrow Order overrides their carefully-calibrated bargain. It delays Ligado's cure payment obligation indefinitely. And it does so based on a potential future claim that may never materialize, in service of a remedy that the parties' agreement forecloses. The order cannot be reconciled with the Cooperation Agreement's unambiguous terms (Section A); it exceeds the equitable power of a bankruptcy court, which under Third Circuit law may not refuse to enforce a contract absent fraud, accident, or mistake (Section B); and it finds no support in Bankruptcy Code section 105(a), which supplies no freestanding authority to override substantive contract rights (Section C). Reversal is required on any one of these grounds

A. **The Cooperation Agreements' Unambiguous Terms Preclude The Relief Imposed By The Bankruptcy Court**

There is no dispute that the premise of the Delay Motion was to modify the Cooperation Agreement. And the Bankruptcy Court's Escrow Order, contrary to the unambiguous and heavily-negotiated terms of the Cooperation Agreement, does just that: Appellees paid the $100 million March 31, 2026 cure payment into an escrow account, rather than to Inmarsat, pending the earlier of (i) the effective date of Ligado's plan of reorganization (which itself is contingent on FCC approval of its application) or (ii) further order of the Bankruptcy Court. ROA.2799.

The Cooperation Agreement is clear that to cure Ligado's pre-petition defaults, Ligado and AST were obligated to make a "lump sum indefeasible payment to Inmarsat in the amount of $100

million" on March 31, 2026.  ROA.1755.  ██████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

The Escrow Order flouts these detailed, agreed contractual procedures.  ██████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████    But the

Bankruptcy Court ordered a new, bespoke option.  It allowed Ligado and AST to indefinitely delay

their obligation to make the cure payment to Inmarsat, and it did so without requiring them to make

the requisite election of remedies or even file suit.  This was all contrary to the carefully crafted

provisions to which the parties agreed.  The Bankruptcy Court directed Appellees to withhold the

payment to Inmarsat they were otherwise required to make while Ligado preserves (or declines to

elect) contractual remedies.  This contravenes established New York law that enforces parties'

negotiated remedy provisions.  *See Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,

106 N.E.3d 1176, 1184 (N.Y. 2018) ("Contract terms providing for a sole remedy are sufficiently

clear to establish that no other remedy was contemplated by the parties at the time the contract was

formed . . . especially when entered into at arm's length by sophisticated contracting parties.")

(quotation omitted).  Thus, the Escrow Order is at odds with the unambiguous terms of the

Cooperation Agreement's payment terms and remedial scheme, which should be enforced as

negotiated and written.

## B.    The Bankruptcy Court Lacked The Equitable Power To Rewrite The Cooperation Agreement

There is no real dispute that that the Cooperation Agreement as written does not authorize

any delay of the $100 million cure payment; that is why the Appellees below asked the Bankruptcy

Court to "use its equitable powers" to "equitably relieve[]" them from making the March 31

payment to Inmarsat that the contract undisputedly requires.  ROA.2045, 2053-54.  The

fundamental flaw with this request, and the resulting Escrow Order, is that the Bankruptcy Court

does not have any such equitable power to rewrite the Cooperation Agreement.

The Third Circuit's decision in *In re Penn Cent. Transportation Co.*, 831 F.2d 1221, controls. In that case, the debtor, Penn Central, and the U.S. government signed a series of post-bankruptcy contracts pursuant to which the government provided funding to keep Penn Central operating during its bankruptcy. The contracts expressly provided "that funds paid to Penn Central in excess of allowable costs were to be returned to the government." *Id.* at 1226-27. The government sought a refund under this provision. The district court refused to enforce the refund obligation as written because it concluded that doing so would "frustrate the intention of the . . . parties" because the "excess" funds were still spent to further the overall goal of ensuring Penn Central's continued operations until its conveyance. *Id.* at 1224.

The Third Circuit reversed, and its holding is dispositive here: "[I]t is well-settled that an equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake." *Id.* at 1228. The court also rejected the notion "that a bankruptcy court may exercise equitable powers to change the terms of the contract[]." *Id.*

The Third Circuit's reversal was driven not only by the mismatch between the contract and the bankruptcy court's determination, but also by what the court discerned about how the parties had reached their agreement. The contracts were not boilerplate; they were the product of "lengthy, intricate negotiations conducted by both sides," which "demonstrate[d] that both parties understood the terms of the contracts as written and agreed to be bound by their terms." *Id.* at 1227. The bankruptcy court held separate hearings before authorizing Penn Central to enter into the contracts, for the very purpose of ensuring "that the parties understood the contract terms." *Id.* And the parties' course of performance confirmed that shared understanding: "[T]he actions of Penn Central and the government during the course of the contract's performance demonstrate[d] that both parties understood their terms." *Id.*

The Third Circuit emphasized that the arrangement the bankruptcy court imposed was one the parties had considered and rejected. "Penn Central's argument is further undone because, though agreements could have been entered into like the one the [bankruptcy] court imposed on the parties, the government consciously chose not to." *Id.* at 1225.

Every premise that drove *Penn Central* is present, and more pronounced, here. The Cooperation Agreement, as amended, was negotiated at arm's length, including pursuant to a mediation presided over by a former federal judge. The parties' sophistication is undisputed. Their course of performance confirms that they understood exactly what the contract required: Ligado paid the first indefeasible cure installment of $420 million on the date specified, without caveat. And by filing the Delay Motion, Ligado itself concedes that the second, $100 million payment was due regardless of any alleged breach—that is why it asked the Bankruptcy Court for equitable modification, rather than enforcement, of the agreement. ROA.2054 n.11 ("Ligado will, in the absence of a Court order granting the relief sought in this Motion, make the Upcoming Cure Payment.").

The arrangement the Bankruptcy Court ordered—an indefinite hold on the cure payment pending FCC resolution—is precisely the arrangement Ligado sought, Inmarsat rejected, and the parties ultimately declined to adopt. When Ligado first moved for approval of the AST Transaction, it proposed to defer all cure payments until FCC approval. ROA.386. Inmarsat objected. *Id.* The negotiated compromise, reflected in the Term Sheet and later in Amendment No. 22 to the Cooperation Agreement, was the opposite: indefeasible payments on dates certain, with only a single $15 million "Emergence Payment" tied to FCC approval. ROA.1755. As in *Penn Central*, the alternative arrangement "could have been entered into" but the parties

"consciously chose not to."  831 F.2d at 1225.  And as in *Penn Central*, what the Bankruptcy Court styled as equitable relief was, in substance, judicial alteration of the written contract.

The Bankruptcy Court attempted to distinguish *Penn Central* on the basis that that case did not involve a "live dispute" regarding "breaches of reciprocal obligations under this same contract."  ROA.2794-95.  But *Penn Central* did not carve out a counterclaim exception.  It did not condition contract enforcement on the absence of a live dispute.  It stated a categorical rule grounded in the sanctity of sophisticated parties' negotiated bargains:  "*[A]n equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake*."  *Penn Cent.*, 831 F.2d at 1228.  The Bankruptcy Court's approach would turn that rule into an invitation:  Any party unhappy with a contractual obligation could assert that it has a "colorable" counterclaim and thereby convert the bankruptcy court into a roving editor of commercial agreements.  Unsurprisingly, no court has endorsed such a rule.

Even beyond *Penn Central*, the Third Circuit has repeatedly rejected attempts to invoke equitable authority to override unambiguous contract terms.  *See In re Telephone Warehouse, Inc.*, 124 F. App'x 724, 728 (3d Cir. 2005) (where "the parties have pointed to nothing that would justify a modification of their agreement, . . . the Bankruptcy Court's equitable power cannot be invoked to avoid the agreement's otherwise enforceable terms"); *In re WorldCorp, Inc.*, 252 B.R. 890, 897 (Bankr. D. Del. 2000) ("[Reformation] is not available where a party to a fully integrated, unambiguous, executed contract seeks to rewrite the contract to include terms that a party wishes he had bargained for, but did not[.]").  Indeed, the Third Circuit's decision in this very case admonished that "'[s]ympathy aside, it is axiomatic that a court may not rewrite the clear provisions of a contract to make it more reasonable or to protect a party against an unwelcome result.'"  *In re Ligado Networks, LLC*, 2026 WL 611177, at *3 (3d Cir. Mar. 2, 2026) (quoting

*Brisbin v. Superior Valve Co.*, 398 F.3d 279, 290 (3d Cir. 2005)); ROA.2153.  That decision arose out of the same contract, involving the same parties, and cautioned against precisely what the Bankruptcy Court has now done.

Similarly, under New York law, which applies to the Cooperation Agreement, courts do not have the authority to alter the negotiated unambiguous terms of the parties' agreement to excuse or delay performance.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884,  892 (2nd Cir. 1990) (vacating district court's order extending contractual deadlines to cure pending merits adjudication).  In *Metropolitan Life*, the Second Circuit held that "the cure provisions at issue [were] unambiguous" and that "[i]n tolling the cure periods pending adjudication of the merits . . . [,] the [district] court plainly departed from the express terms of the indentures." *Id.* at 889.  The Second Circuit further held that equitable concerns motivated the district court's decision, but that "it is no less inequitable to deny the lenders their express, bargained-for, contractual limitation on the period during which cure may be effected." *Id.* at 890.  The Second Circuit held that the district court "rewrote the cure provision" in the contract and that "though th[e] reconstruction may have been the 'practical' resolution sought by the district court, it was not authorized by any body of applicable law." *Id.*

Here, the Bankruptcy Court's Escrow Order suffers the same fatal flaws.  The Escrow Order rewrites the parties' express agreement on the timing and amount of cure payments, as well as the exclusive remedy provisions. *See supra* pp. 14-15.  And it does so in service of a supposed "equitable" and practical result that impermissibly clashes with the unambiguous terms of the Cooperation Agreement.

Below, Ligado contended that "courts may generally modify a settlement agreement when [1] a party has materially breached the agreement or [2] when it is otherwise equitable to do so,"

citing *Wolf v. Wolf*, 59 F. App'x 403 (2d Cir. 2003) (unpublished), and *Scharf v. Levittown Pub. Schs.*, 970 F. Supp. 122 (E.D.N.Y. 1997). ROA.2054. But neither case supports these propositions and neither can override the Third Circuit's controlling decision in *Penn Central*.

As an initial matter, neither *Wolf* nor *Scharf* involved an agreement with detailed exclusive remedy provisions, as are present here; thus, those courts were not asked to override express provisions concerning what the parties agreed should occur in the event of a breach. Moreover, Ligado's broader assertion that courts may modify contracts "when it is otherwise equitable to do so" finds no support in either *Wolf* or *Scharf*—neither case mentions any such equitable authority.

*Scharf* appears to be rooted in the contract doctrine of impracticability. 970 F. Supp. at 129. In that case, a school secretary settled her employment discrimination case on terms that required her to be restored to her prior position, but, when she repeatedly breached her obligations in ways that caused her relationship with her boss to "deteriorate[]" and that made it not "feasible" to stay in her prior position, the court authorized transferring her to another school. *Id.* at 125. *Scharf* has no bearing here, where there is nothing infeasible about the Appellees honoring their contractual obligation to make a $100 million payment to Inmarsat rather than place that same amount in an escrow account. Moreover, in *Scharf*, the court held an evidentiary hearing and expressly found that there was a material breach of the settlement agreement. *Id.* at 125, 129. The Second Circuit's unpublished, summary order in *Wolf* is even less helpful for Appellees because the court there found "problematic" and vacated a district court order that went "beyond the plain provisions of [a] Settlement Agreement and modifie[d] its terms" without finding a material breach had occurred. 59 F. App'x at 406.

## C.    Bankruptcy Code Section 105(a) Does Not Provide An Independent Basis Of Authority For The Bankruptcy Court's "Roving Commission of Equity"

The Bankruptcy Court improperly invoked section 105(a) of the Bankruptcy Code as the sole basis to modify the Cooperation Agreement and relieve Appellees of their contractual obligation to make the March 31, 2026 indefeasible payment.  ROA.2799 (court acting "pursuant to section 105(a) of the Bankruptcy Code . . ."). Yet the U.S. Supreme Court has admonished that a bankruptcy court's "equitable powers" must "only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).  Section 105(a) itself does not provide the "roving commission to do equity" as the Bankruptcy Court seeks to do here.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).  No substantive Code provision authorized the Bankruptcy Court to redline the parties' agreement, and section 105(a) is not a catch-all that supplies authority the rest of the Code withholds.

Under section 105(a), a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).[4]  This provision, however, does not authorize the bankruptcy courts to "create substantive rights that would otherwise be unavailable under the Bankruptcy Code." *In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (quoting *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992)).  Rather, it "serves only to carry out authorities expressly conferred elsewhere in the code." *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 216 n. 2 (2024) (quotations omitted).  Thus, any "exercise of

---

[4]  The second sentence provides: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). Per the Supreme Court, "[t]he second sentence of § 105(a) adds little to the analysis. … Even if the 'abuse of process' language were deemed to confer additional authority beyond that conferred by the first sentence (which is doubtful), that general authority would also be limited by more specific provisions of the Code." *Law v. Siegel*, 571 U.S. 415, 421 n.1 (2014).

§ 105 power" must "be tied to another Bankruptcy Code section." 2 Collier on Bankruptcy §105.01 (16th ed. 2025).

The Bankruptcy Court cited only to section 105(a) in the Escrow Order; it cited no other provision of the Bankruptcy Code. ROA.2799-80. The reason for this is simple—there is no provision of the Code that authorizes the Bankruptcy Court's modification of a contract based on a purported "colorable" claim for breach of contract. No provision of the Bankruptcy Code displaces hornbook law that where a contracting party believes there has been a material breach of a contract, it has only two options: it can (1) cease performance and sue for 'total breach'"; or (2) continue performance "while suing in partial breach." *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991) (New York law). There is no authority, in the Bankruptcy Code or elsewhere, for a third option whereby a court can unilaterally rewrite the contract for the benefit of the party that may allege a breach.

## II. EVEN IF THE BANKRUPTCY COURT HAD THE AUTHORITY TO ENTER THE ESCROW ORDER, ITS PROCESS AND FINDINGS WERE INADEQUATE

Even if the Bankruptcy Court somehow had the authority to equitably revise the parties' agreement, its process and findings were not remotely sufficient to justify that intervention. *First*, the Bankruptcy Court proceeded by mere motion practice rather than by adversary proceeding, despite Federal Rule of Bankruptcy Procedure 7001(g)'s categorical command that equitable relief requires an adversary proceeding (Section A). Indeed, had the Bankruptcy Court proceeded via adversary proceeding, it may have properly held an evidentiary hearing and made the findings necessary for extraordinary relief like a stay or injunctive relief, rather than granting improper "equitable" relief based on unasserted and unadjudicated claims.

*Second*, the Bankruptcy Court was not the proper forum for such a suit in any event. The Cooperation Agreement contains an Exclusive Forum Provision directing all disputes to New York

courts, ROA.1754-55 n.12, and the Third Circuit enforces such clauses against bankruptcy courts in non-core matters absent a strong showing of unreasonableness and injustice. Here, there was not even an attempt to carry that burden, and the Bankruptcy Court did not even consider the Exclusive Forum Provision's applicability (Section B).

Either of these defects independently requires vacatur.

### A.    The Equitable Relief Granted By The Bankruptcy Court Required An Adversary Proceeding Under Rule 7001(g)

Independent of the substantive defects, the Bankruptcy Court lacked procedural authority to grant equitable relief by motion. Federal Rule of Bankruptcy Procedure 7001(g) requires that any "proceeding to obtain an injunction or other equitable relief" be commenced as an adversary proceeding. Fed. R. Bankr. P. 7001(g). The rule is categorical. And the consequence of a violation is mandatory: an order entered by motion must be vacated.

The text is unambiguous. Rule 7001(g) includes within the definition of adversary proceeding "a proceeding to obtain an injunction or other equitable relief—except when the relief is provided in a Chapter 9, 11, 12, or 13 plan." Fed. R. Bankr. P. 7001(g). The Third Circuit has held that "where the Rules require an adversary proceeding," such as for injunctive and equitable relief, "a creditor has the due process right not to have that issue resolved without one." *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008). The relief Appellees sought is quintessential equitable relief. It is, in substance, a prejudgment impoundment of a contractual payment to secure a contingent future claim—a remedy provided for in neither contract nor statute. Ligado's counsel said so on the record: "[W]e are not making the election to pursue contract damages; we are, instead, simply asking for equitable and injunctive relief." ROA.2755; *see also id*. at ROA.2788 ("[T]he agreement allows us to seek specific performance . . . and other injunctive relief, that I

think is what we are doing here").[5]   Thus, there is thus no dispute that Ligado initiated "a proceeding to obtain an injunction or other equitable relief."

The consequence is mandatory vacatur.  An adversary proceeding "commenced by motion rather than by complaint will be dismissed" and any "order entered in an action [covered by 7001] commenced by motion will be vacated."  *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990).  The District of Delaware has applied that rule recently, holding that a bankruptcy court "properly denied the Motion as procedurally improper because it sought [injunctive] relief that the Bankruptcy Court may not grant by motion."  *In re Prehired, LLC*, 2025 WL 2661765, at *4 (D. Del. Sept. 17, 2025).  And even where a bankruptcy court has approved a settlement agreement, it may not issue injunctive relief absent an adversary proceeding.  *In re SS Body Armor I, Inc.*, 615 B.R. 540, 550 (Bankr. D. Del. 2020).

The Bankruptcy Court previously reasoned—when compelling Inmarsat to support the FCC application and dismiss its New York complaint by motion—that "the relief that would be enforced here was enforced under a plan," and therefore fell within the Rule 7001(g) exception. ROA.1913.  Under Rule 7001(g), injunctive and equitable relief requires an adversary proceeding "except where the relief is provided in a … plan."  Fed. R. Bankr. P. 7001(g).  This plan exception, properly understood, covers cases in which the plan itself specifically provides for the injunctive relief: discharge injunctions, channeling injunctions, or the like.  *See In re Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010); *In re Continental Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999).  The Bankruptcy Court previously (and errantly) determined this exception applied, presumably

---

[5]   In its Delay Motion, Ligado asked the Bankruptcy Court to use its "equitable powers" to allow Ligado to delay making the "Upcoming Cure Payment."  ROA.2053-55.  At the hearing on the Delay Motion, Ligado's counsel characterized its request as "injunctive relief."  ROA.2789.  Whether the remedy imposed by the Bankruptcy Court was an injunction or other form of equitable relief, an adversary proceeding was required.

because Ligado's plan requires *Ligado's and AST's* (but not Inmarsat's) continued performance in accordance with the "AST Definitive Agreements," which are defined as the "documents that govern the AST Transaction," which would include the Cooperation Agreement.  ROA.759, 789.  Inmarsat has appealed that ruling, which remains before this Court.  Here, there is simply no connection whatsoever between the equitable relief sought—modification of the written terms of the Cooperation Agreement—and Ligado's plan.  In fact, Ligado's plan expressly defers to the plain language and terms of the Cooperation Agreement, providing that notwithstanding anything else therein, "in the event of a conflict between the AST Definitive Agreements Order,[6] on the one hand, and the Plan, Confirmation Order, or any other documents related thereto, on the other hand, the terms of the AST Definitive Agreements Order shall control."  ROA.789.

Even if prejudice were required, the absence of an adversary proceeding is not harmless.  Adversary proceedings exist because they provide procedural protections commensurate with the relief at stake: pleadings; discovery; evidentiary hearings; a developed record.  *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008).  A hearing held 14 days after the filing of a mere motion cannot substitute for those protections.  Although there is no doubt that the plain language of the agreement provides for payment on March 31 independent of any putative regulatory-support breach, an evidentiary hearing would have foreclosed the equitable predicates the Bankruptcy Court appears to have assumed.  For example, Inmarsat's parent, Viasat, Inc., is a publicly traded global satellite communications company of strong financial position.  Viasat, Inc., Quarterly Report (Form 10-Q), at 54 (filed Feb. 6, 2026).  Thus, there was no basis to "protect Ligado's potential right to recover . . . damages under [the Cooperaiton Agreement] if at some point they

---

6  The "AST Definitive Agreements Order" is defined as the Bankruptcy Court order authorizing Ligado's entry into the mediated Term Sheet.  ROA.759.  The Bankruptcy Court subsequently ordered that the Term Sheet be adopted as the Cooperation Agreement.  ROA.399-402.

can prove there were damages." ROA.2795. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████. *Infra* Section III.A.

And yet the Bankruptcy Court made no findings on any of these points: not on Ligado's likelihood of success on the merits, nor Inmarsat's ability to satisfy a future judgment, irreparable harm, the balance of equities, or public interest.

Even if applicable law allowed a court to alter the unambiguous terms of a contract to excuse a party's performance pending a merits determination (it does not), the foregoing findings would be necessary to do so. Indeed, at the March 30 hearing, Ligado's counsel belatedly asserted that the relief it sought was "injunctive relief," which would require such findings. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (to issue preliminary injunction, court must consider whether requesting party has shown a likelihood of success on the merits, likelihood it will suffer irreparable harm, that the balance of equities tips in its favor, and that an injunction is in the public interest); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 394 (2006) (vacating judgment below where lower courts failed to apply the four-factor test for granting permanent injunction: plaintiff has suffered irreparable injury; no remedies available at law; considering balance of hardships, a remedy in equity is warranted; and the public interest will be served by permanent injunction). The Bankruptcy Court made none of these findings, nor could it, yet nevertheless modified the parties' agreement to delay payments due and owing to Inmarsat, purportedly to "protect" Ligado's hypothetical recovery on a hypothetical breach claim, on a record that developed none of these elements. ROA.2795.

**B.    The Bankruptcy Court Should Not Have Exercised Jurisdiction Over A Dispute Governed by the Cooperation Agreement's Exclusive Forum Provision**

The Bankruptcy Court also erred in exercising jurisdiction over this dispute at all.  The Cooperation Agreement contains an Exclusive Forum Provision, which directs that all disputes (with one irrelevant exception) are to be adjudicated in state or federal court in New York.  ROA.1754 & n.12.  This Exclusive Forum Provision was bargained for by the parties and approved by the Bankruptcy Court.  But that is not all.  When the parties reached an impasse in negotiating the definitive documents to implement their term sheet, the Bankruptcy Court declined to resolve that dispute, ordering instead: "[t]he parties are directed to include the language that is specifically identified in the settlement term sheet.  If there is a dispute about what it ends up meaning in concrete terms and practical terms, then there is a way in that settlement term sheet to deal with that.  It provides where you go if you have a disagreement and you can deal with it there."  ROA.706.  That Exclusive Forum Provision should be enforced, and the Bankruptcy Court erred in ignoring it.

**1.    The Cooperation Agreement's Exclusive Forum Provision Governs This Dispute**

The Cooperation Agreement contains a forum selection clause.  That clause provides that "***all disputes***" (with an inapplicable exception) would be resolved in the Court" (*i.e.*, the state or federal court in New York).  ROA.1754 n.12 (emphasis added).

The present dispute arises out of the Cooperation Agreement.  Appellees sought an "equitable" delay of their indefeasible cure payment obligation under the Cooperation Agreement, and they did so on the basis that Inmarsat purportedly breached its obligations thereunder to support Ligado's regulatory application.  *See, e.g.*, ROA.2055.  And the Bankruptcy Court granted the relief appealed from (the escrowing of payments indefeasibly owed to Inmarsat) on the very

basis that "there is a colorable argument that Ligado has a breach claim," and that an escrow would "protect Ligado's potential right to . . . recover damages from Inmarsat under this agreement if at some point they can prove that there were damages."  ROA.2795.

### 2.    The Exclusive Forum Provision Should Be Enforced

In this Circuit, under the Supreme Court's *Bremen* test, "a forum selection clause is presumptively valid and will be enforced unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983) (citing *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-11 (1972)).  The law in this Circuit is also clear that "***bankruptcy courts must apply The Bremen test to determine whether a forum selection clause should be enforced***.  In turn, absent a strong showing by the party opposing enforcement that the conditions under *The Bremen* have been met, ***the bankruptcy court must enforce the forum selection clause***."  *In re Diaz Contracting, Inc.*, 817 F.2d 1047, 1054 (3d Cir. 1987) (citing *Coastal Steel v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983)) (emphasis added).  The "heavy burden" to overcome a forum selection clause falls on the party resisting its enforcement.  *See Diaz Contracting, Inc.*, 817 F.2d at 1051-53.

Here, Appellees did not even seek to carry their burden, and the Bankruptcy Court failed to consider the Exclusive Forum Provision at all.  Regardless, Appellees would not have been able to make the required showing.

***First***, Appellees have not asserted (nor could they) that there was any fraud or overreaching in connection with the drafting or execution of the Exclusive Forum Provision.  All parties were represented by sophisticated counsel and freely negotiated that provision.

*Second*, enforcing the Exclusive Forum Provision here would not violate any strong public policy of the forum.  The Third Circuit rejects "the notion that the policy of the bankruptcy court of facilitating the collection and distribution of debtor estates in itself exempts that court from the public policy favoring the enforceability of forum selection clauses."  *Diaz Contracting, Inc.*, 817 F.2d at 1051 n.9.  Moreover, "not only is there no *per se* strong public policy emanating from the Bankruptcy Code which would overrule a forum selection provision, but any bankruptcy concern must be lessened by the event of confirmation—an event which greatly lessens the 'tutelage' status of the debtor.  In short, forum selection clauses have even more force after confirmation, when bankruptcy court oversight is lessened, than prior to confirmation."  *In re Almarc Corp.*, 94 B.R. 361, 366 (Bankr. E.D. Pa. 1988) (citation omitted).  Here Ligado's chapter 11 plan was confirmed on September 29, 2025.  *See* ROA.715-822.[7]

This dispute is also "non-core," and thus there is no basis for departing from the *Bremen* test.  "In order to evaluate whether a claim is 'core,' a court must first look to the illustrative list of 'core' proceedings found in § 157(b)(2).  It must then conduct this Court's two-step test, according to which a claim will be deemed core if (1) it invokes a substantive right provided by title 11 or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."  *In re Exide Techs.*, 544 F.3d 196, 206 (3rd Cir. 2008).  The dispute here involves an alleged breach of the Cooperation Agreement, and a request for relief to modify performance thereunder.  It does not invoke a substantive right provided by title 11 (*i.e.*, the Bankruptcy Code).  *In re Axiant, LLC*, 2012 WL 5614588, at *4 (Bankr. D. Del. Nov. 15, 2012) (breach of contract claims are non-

---

[7] The confirmation of the plan, and its retention of jurisdiction over certain matters, supports enforcement of the forum selection clause here.  Specifically, the plan retains jurisdiction over numerous matters (28 enumerated matters to be precise).  ROA.818-20.  Disputes regarding the Cooperation Agreement are not among them.  Indeed, the plan provides that the Term Sheet (which contains the forum selection clause) controls in the event of a conflict with the plan.  ROA.789.

core).  The fact that the Bankruptcy Court relied (improperly) on Bankruptcy Code section 105(a) to grant equitable relief does not transform the dispute into a core proceeding.  *Cf. In re Forever 21, Inc.*, 623 B.R. 53, 63 (Bankr. D. Del. 2020) ("[S]ection 105(a) has a limited scope.  It does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code.") (internal quotations omitted).  Nor is this dispute one that could only arise in a bankruptcy case.  Indeed, what Appellees obtained from the Bankruptcy Court—putting funds owed to Inmarsat in escrow pending an unasserted breach of contract claim—is, in substance, an unlawful prejudgment attachment or impoundment (without, of course, the semblance of appropriate due process or findings).

*Third*, Appellees have not shown (or even attempted to show) that "enforcement [of the Exclusive Forum Provision] would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable."  *Coastal Steel*, 709 F.2d at 202.  Appellees could not make that showing in any event.  During its bankruptcy case, Ligado itself sued Inmarsat in New York state court under the Cooperation Agreement.  *See* ROA.1756 (referencing New York state complaint).  It cannot now complain that a dispute concerning that same agreement is unreasonably inconvenient in New York.  Nor does Ligado or AST even attempt to make such a showing.

Accordingly, under the *Bremen* test, the Exclusive Forum Provision applies and the Bankruptcy Court should not have exercised jurisdiction over this matter.

## III.   EVEN IF THE EQUITIES WERE RELEVANT, THEY DO NOT FAVOR THE BANKRUPTCY COURT'S MODIFICATION OF THE TERMS OF THE COOPERATION AGREEMENT

Even if the Bankruptcy Court had the substantive and procedural ability to alter the Cooperation Agreement under equitable principles, the equities here do not support doing so.  The Bankruptcy Court premised the relief it granted on the notion that Ligado holds a "colorable"

breach claim with damages that "could really be large," ROA.2795-96—



### A.    The Bankruptcy Court's Equitable Justification Relies On A Chain of Speculation

The Bankruptcy Court's core equitable justification that Ligado has a "colorable" breach claim and damages "could be large" rests on a chain of speculation that is not sufficient to impound a liquidated payment obligation.





The Bankruptcy Court contended with none of these contingencies when concluding that Ligado has a "colorable" breach claim and damages "could be large" such that the liquidated contractual payment owed to Inmarsat could be impounded to effectuate a potential setoff. And New York law forbids it. Under New York contract law, "there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable." *Parlux Fragrances*, 204 A.D.3d at 89 (citation omitted). A party holding a contingent, future claim does not receive preferential treatment over other would-be litigants with similar speculative claims, unless the

party can meet the strict standards for a prejudgment attachment.  The Southern District of New York explains that "attachment for security purposes is only appropriate when plaintiff will have difficulty enforcing a judgment and, accordingly, should issue only upon a showing that drastic action is required[;]" including, for example, when defendant "has disposed or is about to dispose of any property in order to frustrate a potential judgment, or to flee the jurisdiction of the Court." *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073-74 (S.D.N.Y. 1994).  No such showing was made.  No such finding was entered.

Federal equity supplies no broader authority.  In *Grupo Mexicano*, the Supreme Court held that federal courts lack equitable power to enjoin a defendant's use of unencumbered assets to secure a money claimant's anticipated judgment, because "such a remedy was historically unavailable from a court of equity."  *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).  The Court grounded that limit in the "historical principle" that "before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor," *id.* at 330, and emphasized that federal equity is "confined within the broad boundaries of traditional equitable relief," *id.* at 322.  Here, the Bankruptcy Court impounded a specific, liquidated payment that Inmarsat was contractually entitled to receive on March 31, to secure a claim Ligado has not reduced to judgment and on which the court entered no finding of any alleged breach.  The order does exactly what *Grupo Mexicano* forbids—convert an unsecured, contingent claim into a *de facto* secured one by judicial fiat, on nothing more than a "colorable" allegation and the prospect that damages "could be large."

**B.** ██████████████████████████████████████████████████

The Bankruptcy Court's equitable analysis appeared to have been colored by its stated view that Inmarsat had filed its Petition to Deny to "get out in front of the Third Circuit."  ROA.2795.

The record does not support that inference, and the consequences the Bankruptcy Court drew from it do not follow.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

The apparent basis for the Bankruptcy Court's belief that Inmarsat filed its Petition to "get out in front of the Third Circuit" is the Appellees' reference to a statement made by Inmarsat's counsel during argument before the Third Circuit regarding the stay. Specifically, when Judge

Ambro asked why Inmarsat did not wait until Monday, March 2 (*i.e.*, the comment deadline) to file the letter, Inmarsat's counsel answered:

> Well, Judge Ambro, all our rights hinge on that filing. We had no idea what was going to happen if [Ligado and AST at] the last minute, would convince the Court to issue an administrative stay that would cause us to forfeit our appeal rights against FCC, an adverse FCC decision, in our view. We got a stay. The other side could have, in their opposition papers in the district court, said, In the event of an adverse decision, Your Honor, we would like lead time and administrative stay. They did not do that. They did not e-mail us when it came down and said, We're going to seek a stay. Please hold off. We had very little time to protect extremely valuable rights in the FCC. If we don't have that on file today, we lose our appeal rights from an adverse FCC decision. It all goes away.

ROA.1987-88. Appellees, and apparently the Bankruptcy Court, treat this statement as if Inmarsat were admitting that it filed the Petition to Deny because there was a risk that the Third Circuit would decide to vacate this Court's stay. That misunderstands or misconstrues the statement's emphasis on the risk of a non-merits-based ***administrative*** stay.

. *See United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of application to vacate stay) ("Administrative stays do not typically reflect the court's consideration of the merits of the stay application."). Obviously, Inmarsat did not foresee a panel of the Third Circuit considering, let alone resolving, a stay motion on the merits in under 96 hours (most of which was over a weekend). Neither did Ligado, whose counsel acknowledged "we, like [Inmarsat's counsel], didn't think that we'd get an audience with [the Third Circuit] over the course of a weekend." ROA.2783. Inmarsat thus was not attempting to evade appellate review of the Bankruptcy Court's January Order, as Appellees and the Bankruptcy Court have suggested,



. On this record, the Bankruptcy Court's apparent views of the equities cannot bear the weight the Escrow Order places on them.

## CONCLUSION

For the foregoing reasons, Inmarsat respectfully requests that the Court reverse or vacate the Bankruptcy Court's order.

<table>
<tr><td>STEPTOE LLP</td><td>PACHULSKI STANG ZIEHL & JONES LLP</td></tr>
<tr><td>By: <em>/s/ Alfred M. Mamlet</em></td><td>By: <em>/s/ Laura Davis Jones</em></td></tr>
<tr><td>Alfred M. Mamlet (admitted <em>pro hac vice</em>)<br>1330 Connecticut Ave NW<br>Washington, DC 20036<br>(202) 429-3000<br>amamlet@steptoe.com</td><td>Laura Davis Jones (DE Bar No. 2436)<br>Peter J. Keane (DE Bar No. 5503)<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705<br>(302) 652-4100<br>ljones@pszjlaw.com<br>pkeane@pszjlaw.com</td></tr>
<tr><td>Charles Michael (admitted <em>pro hac vice</em>)<br>1114 Avenue of the Americas<br>New York, New York 10036<br>(212) 506-3900<br>cmichael@steptoe.com</td><td></td></tr>
</table>

4918-7478-2379.1 42241.00001

42

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Benjamin Finestone*
    Benjamin Finestone
    Kate Scherling
    295 5th Avenue
    New York, NY  10016
    (212) 849-7000
    benjaminfinestone@quinnemanuel.com
    katescherling@quinnemanuel.com

    John Bash
    Matthew Scheck
    Jacob C. Beach
    300 West 6th St., Suite 2010
    Austin, TX  78701
    (737) 667-6100
    johnbash@quinnemanuel.com
    matthewscheck@quinnemanuel.com
    jacobbeach@quinnemanuel.com

*Counsel for Inmarsat Global Limited*

## CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8015(h)

The undersigned certifies that the *Opening Brief on Appeal* filed by Appellant Inmarsat Global Limited does not exceed 13,000 words in accordance with Federal Rules of Bankruptcy Procedure 8013(a)(7)(B)(i) and 8015(h).

Dated: May 13, 2026                                    PACHULSKI STANG ZIEHL & JONES LLP

                                                        By:     */s/ Laura Davis Jones*